Filed 12/8/15  P. v. Brown CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>RASHAD BROWN et al.,<br><br>        Defendants and Appellants. | A139515<br><br>(San Francisco County<br>Super. Ct. No. 211644) |

The Attorney General commences her respondent's brief with the arresting—and accurate—statement that defendants Rashad Brown and Anthony Taylor "tried to murder the same person with the same weapon, in the same place, in two incidents over about two weeks."

A jury found Brown guilty as charged of the attempted murder of Jacob Levu (Pen. Code,[1] §§ 187, 664); assaulting Levu with a semiautomatic firearm (§ 245, subd. (b)); discharging a firearm at an inhabited dwelling (§ 246); being a participant in a criminal street gang (§ 186.22, subd. (a)); and being a past-convicted felon in possession of a firearm (former § 12021, subd. (a)(1)), all of which occurred on April 28, 2009.  The same jury found Taylor guilty as charged of the attempted murder of Levu; assaulting Levu with a semiautomatic firearm; and being a participant in a criminal street gang, all of which occurred on May 16, 2009.  The jury further found true numerous enhancement allegations concerning personal use of a weapon and gang membership.  The trial court

---

[1]Statutory references are to the Penal Code unless otherwise indicated.

1

then found true allegations that Brown had prior felony convictions. Brown was sentenced to state prison for a total term of 55 years to life, Taylor for a total term of 40 years to life.

Defendants' primary contention concerns the gang participation convictions under section 186.22. Relying primarily on *People v. Rodriguez* (2012) 55 Cal.4th 1125 (*Rodriguez*)—where our Supreme Court held that conviction under this statute is improper when the defendant, even if a member of a criminal street gang, acts alone or for a personal motive—defendants contend that their convictions for violating section 186.22 are not supported by substantial evidence, and that the jury was not properly instructed. They further contend that their severance motion ought to have been granted, and that one of the restitution fines imposed at the time of sentencing was in violation of the ex post facto prohibition. Taylor alone also contends that he was deprived of his constitutional right to the effective assistance of counsel when his trial attorney failed to move for a mistrial during Brown's cross-examination of the prosecution's expert on gangs. We conclude that the instructional error did occur as claimed, but it was not prejudicial. We conclude that the other contentions are without merit. We therefore affirm the judgments of conviction.

## BACKGROUND

The salient events are not truly disputed. Neither Brown nor Taylor dispute the verdicts concerning possession and actual use of firearms in the assaults on Levu. The separate briefs filed by appointed counsel for Brown and Taylor demonstrate that counsel have a complete understanding of the trial record. In light of these circumstances, there is no necessity to set forth all details shown by the record. The following narrative is governed by the principle that the record is to be viewed in the light most favorable to the prosecution. (*People v. Maury* (2003) 30 Cal.4th 342, 403.)

Although the charged shootings occurred in 2009, the first bullet was fired in December 2006, when victim Levu was 16 years old. That was when Levu was in the company of Brown who—like Brown—Levu deemed an acquaintance, not a friend. Both Levu and Brown were armed, but it was Brown who fired his weapon, in an area of

2

San Francisco claimed by the West Mob Gang. Levu had relatives who were members of that gang. When questioned by police, Levu identified Brown as the person who had pulled the trigger. Levu's mother, concerned for his safety, relocated the family to Las Vegas. On the other hand, in the words of the prosecution gang expert, "Mr. Brown incurred a conviction for the negligent discharge of a firearm," and served a term of incarceration.

By April of 2009, Levu had returned to San Francisco, and was living with relatives. On the morning of April 28, he was smoking a cigarette with his mother in front of his house. He saw a group of young men, including Taylor, loitering across the street, which was unusual—and "spelled danger."[2] Brown, whom Levu had not seen since 2006, approached from across the street (but not from within the group that included Taylor), in effect accused Levu of being an informer, produced a gun, and started firing at Levu. Levu ran back inside his house. He and his mother testified that multiple bullets hit the house. When the firing ceased, Levu's brother saw Brown running from the scene.

Levu immediately relocated to a different residence. From a photo line-up, Levu identified Brown to police as the shooter. When Brown was arrested two months later, he was in the company of two West Mob members.

On the morning of May 16, 2009, Levu had returned to the family home. He was giving his brother a haircut outside their house when Taylor emerged from behind a tree, gun in hand, pointed it at Levu, and shot him while he was trying to shield his brother. Shot multiple times,[3] Levu identified his attacker to police as "Anthony." Levu's brother

---

[2]Levu's mother testified that she saw Levu speak with Brown, but she did not recall seeing the group of youths.

[3]The parties in effect stipulated before the jury that Levu "suffered the following injuries from the shooting: Multiple gunshot wounds to the pelvis, scrotum and buttocks; through and through bladder injury; active extravasation in the right pelvis; right comminuted pelvic rami fractures; right distal femur fractures; sacral fractures; and right iliac bone fractures. These injuries constitute great bodily injury." A further stipulation advised the jury that a June 22, 2009 search of a vehicle found a semiautomatic Glock

identified Taylor from a photo line-up. Levu's sister testified that she heard Taylor's voice and saw him holding a gun, and then shooting down at Levu on the ground.

San Francisco Police Inspector Broberg was the prosecution's expert on criminal street gangs, specifically, "African-American gangs in the Bay View." He testified that he knows that one such gang, the West Mob, has been in existence since the 1990s. At the time of the Levu shootings, the West Mob had 75 to 100 members and associates. It has distinctive hand recognition signals (aka "gang signs"). Broberg has investigated more than a hundred crimes committed by the gang, whose primary criminal activities are concentrated on violence, guns, and the sale of controlled substances ("homicides, aggravated assaults, shootings, robberies, narcotics violations, weapons violations")[4]. The concept of "snitching" is treated as a betrayal of trust, of "the whole concept of the gang," and "a sign of weakness within that gang." Perception was sometimes more important than reality: "[M]any times there have been individuals that even have just been perceived to be snitches. They haven't actually cooperated with the police, haven't given information but just the perception of being a snitch has caused them either to get shot or to get killed."

---

handgun in the possession of one Cameron Enis (a deceased member of a different gang who had relationships with some West Mob members), and that a forensic analysis disclosed "that there was a match from that Glock to the shell casings found at the two shootings in this case."

[4]As will be shown, to prove that a collection of individuals qualifies as a "criminal street gang" within the meaning of section 186.22, the prosecution must establish that the gang has as its "primary activities" the commission of one or more of the crimes enumerated in the statute, and has engaged in a "pattern of criminal gang activity" by committing two or more such "predicate offenses," which need not be "gang related." (§ 186.22, subds. (e), (f); *People v. Gardeley* (1996) 14 Cal.4th 605, 617, 621–622.) The predicate offenses identified by Inspector Broberg as occurring between 2004 and 2009 were: the murder of a police officer and attempted murder of another in 2004; a 2006 kidnapping and assault; illegal gun possession in 2008; attempted robbery in 2009; a 2007 sale of cocaine; and possession of a large amount of cocaine for sale in 2008. None of these offenses involved either Brown or Taylor, but "[t]he predicate offenses offered to establish a 'pattern of criminal gang activity' . . . need not be related to the crime [charged] or even the defendant." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.).

Inspector Broberg presented his opinion that both Brown and Taylor were members of the West Mob on April 28, and Taylor also on May 16. The conclusion about Brown was based on "incidents where Mr. Brown is present in the gang's territory, where he's present when crimes are being committed while he's in the gang's territory and he's in possession of a gun on a couple different occasions . . . . [¶] And there is that continued, sustained pattern of behavior that Mr. Brown keeps going back, keeps associating with the individuals that he has seen getting in trouble or he has gotten in trouble with. So he's . . . acknowledged the gang's activities and has actually been there and participated in some of them and yet still continues to come back." The reasoning for Taylor was essentially the same.

Based on "a letter that came to light during the course of the investigation," Inspector Broberg concluded the point of the letter was to "get . . . West Mob members to try to locate . . . Jacob Levu and do something to him." Presented with a hypothetical question as to the circumstances of Brown's April 29 attack on Levu, Broberg responded that the attack would be for the gang's benefit in that it would counteract any perception that the gang "will be perceived as weak" and unable to enforce the prohibition on snitching. "And [gangs] present this image to the community that they are there 24/7. The police can't always be there. You can't always be protected, but the gang members will always be there, and this would send a message that if you violate or go against our gang, the consequences could be serious or deadly." Retaliation would also (in the language of section 186.22) "promote, further or assist in any criminal conduct by gang members" because "you are answering an action that . . . would be perceived as a threat to the gang. [I]t's all about the culture and interchangeability of fear and respect. [¶] In order to be respected, you need to be feared. In order to be feared, you have to commit acts of violence."

Inspector Broberg had the same opinion as to a hypothetical for Taylor's May 16 shooting of Levu, i.e., "a second shooting . . . where a member of the same gang tried to kill the same [person] with the same firearm" would likewise be for the gang's benefit: "The first attempt failed, so now . . . another gang member is now attempting to

5

accomplish the same feat and the fact that it is the same gun and . . . . [¶] . . . the same gang trying to address the same issue . . . ."[5]  "[T]he second gang member . . . is stepping in to take care of that problem, and it will bolster the reputation of the gang."  In short, "it was a common goal for the gang attempted by two different members of the same gang."

Dr. Kathy Pezdek testified for both defendants.  She is a professor of psychology specializing in "issues related to eyewitness memory and identification."  After being accepted by the court as "an expert in the area of eyewitness identification," she testified concerning a number of factors that might tend to cast doubt on the accuracy of the identifications of Brown and Taylor.  Community activist Tessie Ester testified as to Taylor's good character.  Lavonda Williams testified that Taylor was with her daughter on May 16 at the time Levu was shot.  Levu's aunt, who was in their house on May 16 and witnessed the shooting of Levu, testified that she made a photo array identification of someone other than Taylor as the shooter.

Neither Brown nor Taylor testified in his own behalf.

In closing argument, Taylor's counsel told the jury "He's not quite the mobster that he's [been] painted."  Counsel stressed his alibi and the likelihood of the Samoan Levu family misidentifying the African-American Taylor.  Counsel for Brown attacked Levu's credibility and his identification.

## REVIEW

Ordinarily, we would address an appellant's contentions in the order in which they are presented in the opening brief, or the chronological order in which the alleged error(s) occurred.  However, due to the centrality of the *Rodriguez* issue in both Brown's and

---

[5]Broberg had previously described the concept of a "gang gun" or "community gun":  "They're basically the same thing.  Many times each of the individuals in a gang either don't have a gun or . . . somebody else will have a gun, and they'll need to use it, and they share, so it becomes a community gun.  [¶]  It would be [in] a place of easy access.  Many times the gang members don't want to have the gun on them in case the police were to come . . . , so it will be hidden nearby, maybe in an electrical box, maybe under some debris or something . . . ."

6

Taylor's briefs, we consider it first.  We emphasize that neither chose to dispute the jury's implicit findings that the West Mob constituted a criminal street gang, what were its primary criminal activities, and that they were active members.

## The Gang Membership Convictions Are
## Supported by Substantial Evidence

Each defendant was convicted of violating subdivision (a) of section 186.22, which provides:  "Any person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang, shall be punished by imprisonment in a county jail for a period not to exceed one year, or by imprisonment in the state prison for 16 months, or two or three years."  This statute prescribes " 'active gang participation where the defendant promotes or assists felonious conduct by the gang.  It is a substantive offense whose gravamen is the participation in the gang itself.' "  (*People v. Ferraez* (2003) 112 Cal.App.4th 925, 930.)

"The elements of the gang participation offense in section 186.22(a) are:  First, active participation in a criminal street gang, in the sense of participation that is more than nominal or passive; second, knowledge that the gang's members engage in or have engaged in a pattern of criminal gang activity; and third, the willful promotion, furtherance, or assistance in any felonious criminal conduct by members of that gang."  (*Rodriguez*, at p. 1130.)

" '[N]ot every crime committed by gang members is related to a gang.'  [Citation.]  As such, with section 186.22(a), the Legislature sought to punish gang members who acted *in concert* with other gang members in committing a felony . . . ."  (*Rodriguez*, at p. 1138.)  "[S]ection 186.22(a) reflects the Legislature's carefully structured endeavor to punish active participants for commission of criminal acts done *collectively* with gang members."  (*Id*. at p. 1139.)

"Section 186.22(a) speaks of 'criminal conduct by *members* of that gang.'  (Italics added.)  '[M]embers' is a plural noun.  The words 'promotes, furthers, or assists' are the

7

verbs describing the defendant's acts, which must be performed willfully. The phrase 'any felonious criminal conduct' is the direct object of these verbs. The prepositional phrase 'by members of that gang' indicates who performs the felonious criminal conduct. Therefore, to satisfy the third element, a defendant must willfully advance, encourage, contribute to, or help *members* of his gang commit felonious criminal conduct. The plain meaning of section 186.22(a) requires that felonious criminal conduct be committed by at least two gang members, one of whom can include the defendant if he is a gang member." (*Rodriguez*, at p. 1132.)

Both Brown and Taylor contend that their respective convictions for violating section 186.22 lack the support of substantial evidence because the evidence shows that each acted alone, and thus not in concert with at least one other gang member.[6] These contentions are to be evaluated according to well established criteria.

"To assess the evidence's sufficiency, we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt. . . . In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the [trier of fact] could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. . . .' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the [trier of fact's decision.] [Citation.] [¶] The same standard governs in cases where the prosecution relies primarily on circumstantial evidence. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

---

[6]This claim was anticipated by Brown's unsuccessful pretrial motion—joined by Taylor—to dismiss the section 186.22 charges against him by reason of *Rodriguez.*

The expert testimony of Inspector Broberg is crucial. The use of expert testimony on gangs "is well established" (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1370) for an obvious reason: "In general, . . . expert testimony concerning the culture, habits, and psychology of gangs is permissible because these subjects are 'sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' " (*People v. Valdez* (1997) 58 Cal.App.4th 494, 506.) "Likewise, an individual's membership in a criminal street gang is a proper subject for expert testimony." (*People v. Duran, supra,* 97 Cal.App.4th 1448, 1464.) A gang expert may testify regarding the hearsay which is the basis for his opinion, so long as the hearsay is competent, meaning that it "is material of a type that is reasonably relied upon by experts in the particular field in forming their opinions" and is "reliable." (*People v. Gardeley*, *supra*, 14 Cal.4th 605, 618.) Examples of competent hearsay are "conversations with gang members as well as with the defendant," "the expert's personal investigation of past crimes by gang members," and "information about gangs learned from the expert's colleagues or from other law enforcement agencies." (*People v. Vy* (2004) 122 Cal.App.4th 1209, 1223, fn. 9; see also *People v. Gardeley, supra,* at p. 620.)

Expert testimony can be substantial evidence for a gang's primary activities (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 324); for an individual's membership and active participation in a gang (*People v. Williams* (2009) 170 Cal.App.4th 587, 625–626; *People v. Duran, supra,* (2002) 97 Cal.App.4th 1448, 1464); and for the predicate offenses (see fn. 4, *ante*; *People v. Duran*, *supra*, at p. 1458), but these are points not contested by defendants.

An expert can also testify concerning "the gang's . . . beliefs and practices," and the expert's testimony can establish "motive, modus operandi, specific intent, [and] means" of gang-related offenses. (*People v. Hernandez*, *supra*, 33 Cal.4th 1040, 1049.) Too, expert testimony can be accepted by the trier of fact as demonstrating that the defendant acted to promote the interests of the gang. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 819–820; *People v. Jasso* (2012) 211 Cal.App.4th 1354, 1378.) An expert's response to hypothetical questions constitutes circumstantial evidence—and thus

9

substantial evidence—if based on evidence presented at trial. (See *People v. Vang* (2011) 52 Cal.4th 1038, 1048; *People v. Rios* (2013) 222 Cal.App.4th 542, 573–574; *People v. Ferraez*, *supra*, 112 Cal.App.4th 925, 929–930.)

Inspector Broberg's answers to both hypothetical and direct questions could, as we must presume they were, form a basis for the jury concluding that each assault on Levu was for the gang's benefit. As Broberg described it, retaliating against Levu's perceived snitching became a gang obligation, binding on all members. The gang was mobilized to find Levu. Once Levu was located, Brown tried first. The jury did not have to believe that Taylor's presence across the street was that of an altogether fortuitous or disinterested bystander. When Brown failed, it was Taylor's turn. Each was using a gun that the jury could conclude fit Broberg's definition of a gang gun (see fn. 5, *ante*), a community asset of the gang that could be used by any member of the gang for a gang purpose. The prosecution presented cell phone records from which the jury could conclude that Brown and Taylor were in constant communication from the day Levu was first shot to the day when he was almost killed. The record has ample substantial evidence that Brown and Taylor were not acting independently when they shot at Levu, but were instead the conscious agents of a criminal street gang, acting for the benefit of that gang, within the meaning of section 186.22.

## There Was No Prejudicial Instructional Error

The jury was instructed with CALCRIM Nos. 1400 and 1401 on the gang participation charges as follows:

"[Defendant] is charged . . . with participating in a criminal street gang in violation of Penal Code section 186.22 subsection (a). To prove that the defendant is guilty of this crime, the People must prove first that [the defendant] actively participated in a criminal street gang;

"Second, that when he participated in the gang, he knew that members of the gang engaged in or have engaged in a pattern of criminal gang activity;

"And three, that [the defendant] willfully assisted, furthered or promoted felonious criminal conduct by members of the gang by directly and actively committing a felony

10

offense. Active participation means involvement with a criminal street gang in a way that is more than passive or in name only.

"The People do not have to prove that [the defendant] devoted all or a substantial part of his time or efforts to the gang or that he was an actual member of the gang.

"Criminal street gang is defined in another instruction to which you will refer, and I'll give you that in a little bit.

"As the term is used here, a willful act is one that is done willfully or on purpose.

"Felonious criminal conduct means committing or attempting to commit the following crimes: Attempted murder, assault with an semiautomatic weapon, or shooting at an inhabited house.

"To decide whether a member of the gang or [the defendant] committed the crimes charged, please refer to the separate instructions that I have given you on those crimes.

"Now, if you find [the defendant] guilty of the crimes charged . . . , or the lesser offense of assault, you must then decide whether for each crime the People have proved the additional allegation that the defendant committed that crime for the benefit of, at the direction of or in association with a criminal street gang. You must decide whether the People have proved this allegation for each crime and return a separate finding for each crime.

"To prove this allegation, the People must prove: First, that [the defendant] committed the crime for the benefit of, at the direction of or in association with a criminal street gang;

"And two, that [the defendant] intended to assist, further or promote criminal conduct by gang members.

"A criminal street gang is any ongoing organization, association or group of three or more persons, whether formal or informal, and first that has a common name or common identifying sign or symbol.

"Two, that has as one or more of its primary activities the commission of murder, attempted murder, assault with a firearm, or assault with intent to commit great bodily

11

injury, sales or transportation for sales of narcotics, illegal possession of a firearm, robbery, grand theft, robbery or shooting at an inhabited dwelling.

"And three, members who acted alone or together engaged in criminal activity.

"In order to qualify as a primary activity, the crime must be one of the group's chief or principal activities rather than an occasional act committed by one or more persons who happen to be members of the group.

"A pattern of criminal activity as used here means: Any combination of two or more of the following crimes or two or more occurrences of one or more of the following crimes:

"Murder, attempted murder, assault with intent to commit great bodily injury, assault with a firearm, kidnapping, robbery, sales or transportation for sale of narcotic[s] or illegal possession of a weapon;

"And two, at least one of those crimes was committed after September 26, 1988;

"Three, the most recent crime occurred within three years of one of the earlier crimes;

"And four, the crimes were committed on separate occasions or were personally committed by two or more persons.

"The [P]eople need not prove that every perpetrator involve[d] in the pattern of criminal gang activity, if any, was a member of the alleged criminal street gang at the time when such activity was taking place.

"The crimes, if any, that establish a pattern of criminal gang activity need not be gang-related. If you find [the defendant] guilty of a crime in this case, you may consider that particular crime in deciding whether one of the group's primary activities was commission of that crime and whether a pattern of criminal gang activity had been proved.

"You may not find that there was a pattern of criminal gang activity unless all of you agree that two or more crimes that satisfy these requirements were committed, but you do not have to all agree on which crimes were committed.

12

"As the term is used here, a willful act is one done willingly or on purpose. Felonious criminal conduct means committing or attempting to commit attempted murder, assault with a semiautomatic firearm, assault, shooting into an inhabite[d] dwelling and illegal possession of a firearm.

"The People have the burden of proving each allegation beyond a reasonable doubt, and if the People have not met this burden, you must find the allegation has not been proved."

Brown proposed this special instruction, which the trial court declined to give: "In order to convict the defendant of the above crime[s], the prosecution must prove beyond a reasonable doubt that two or more people must act together and commit the underlying felony together in order for a gang crime to have been proved to find the allegation true. If you have a reasonable doubt as to whether two or more people acted together and committed the underlying felony together, you must find the allegation not proved."

The basis for the court's decision cannot be found in the record[7], nor can the decision not to use this language in CALCRIM No. 1400: "At least two gang members of that same gang must have participated in committing the felony offense. The defendant may count as one of those members if you find that the defendant was a member of the gang." (1 Judicial Council of Cal. Crim. Jury Instns. (2015) CALCRIM No. 1400, at p. 1030.) Defendants are thus correct in their contention that the jury was not correctly instructed in accordance with *Rodriguez*. The omission of the CALCRIM language is all the more puzzling given the prominence *Rodriguez* obviously had in defendants' trial strategies.

Nevertheless, we conclude that the error was harmless under any standard for prejudice. The instructions did tell the jury that neither defendant could be convicted of violating section 186.22, or the gang enhancements, unless the jury concluded that each

_____

[7]The Attorney General states in her brief that "The court properly denied the proffered instruction as argumentative. (3 CT 493.)" The cited page shows no reason for the denial of the "Special Instruction One" "Requested by Mr. Brown."

13

"willfully assisted, furthered or promoted felonious criminal conduct by member*s* of the gang by directly and actively committing a felony offense," and "intended to assist, further or promote criminal conduct by gang member*s*." (Italics added.) "Felonious criminal conduct" was defined only in terms of the charged offenses ("[a]ttempted murder, assault with an semiautomatic weapon, or shooting at an inhabited house"). Each and every gang enhancement alleged was found true by the jury. The defense of complete denial and nonparticipation adopted by the defendants was completely rejected by the jury. No evidence or argument was presented that either attack was an individual act. No personal motive was presented. The stark choice given the jury was that the defendants were either not involved at all, or were involved as members of a gang enterprise to secure a gang objective. In light of the evidence, and the defendants' trial strategies, we conclude there was virtually no possibility of a more favorable result in the absence of the error.

### The Trial Court Did Not Abuse Its Discretion When It Denied Defendants' Severance Motion

The prosecutions of Brown and Taylor began separately. On motion of the District Attorney, the cases were ordered consolidated in February 2010, at the conclusion of the preliminary examination. On March 18, 2013, the date set for trial to begin, Brown filed to sever his case from Taylor's on the ground that "[h]ere, there is no joint charge between Brown and Taylor. The fact that the charges involve the same victim does not result in a joint charge between [*sic*] Brown and Taylor because the evidence presented at the preliminary hearing shows an single gunman at each shooting. Approximately three weeks passed between the shootings. Severance is required because there is no joint charge between Brown and Taylor." As requested by Brown, the trial court conducted an extensive evidentiary hearing under Evidence Code section 402, for this and other motions. At the beginning of that hearing, Taylor joined in Brown's motion. At the end of that hearing, and after hearing argument, the court denied the motion as follows:

14

"I think the . . . thing that needs to be addressed . . . is the fact that one of the things the Court has to consider is judicial resources and the convenience of the witnesses. [¶] We have the same witnesses . . . for both cases. We have the same gun. As I said, this is close in time. [I]t's clearly involving the same parties, the same witnesses. Judicial economy particularly in this day and age, I think really does outweigh just separating them, and then you add that with the closeness in time of the two events and the use of the same gun. [¶] Yes, . . . given all the guns I've been hearing about, it's kind of amazing they found the same gun to be used. What a coincidence." [¶] . . . [¶] "So I am going to exercise my discretion, and even assuming if I were to grant the *Rodriguez* motion [see fn. 6, *ante*], I still think that there is sufficient crossover of facts, witnesses. . . . [W]e're not going to be saving anything by trying this case two times. [¶] I think any evidence at this point that would require a severance has been excluded, so there's no basis for me to be required to sever, and I am going to exercise my discretion and I find that exercising that discretion, the motion should be denied."

Defendants contend that this decision should be overturned. They found their argument on this language from our Supreme Court in 1978: "Section 1098 of the Penal Code provides in part, 'When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order separate trials.' We construe the section to mean that a defendant may not be tried with others who are charged with different crimes than those of which he is accused unless he is included in at least one count of the accusatory pleading with all other defendants with whom he is tried. [¶] The requirement of the section that defendants jointly charged be jointly tried—unless in the trial court's discretion separate trials are appropriate—clearly implies that a joint trial is improper if there is no joint charge. Decisions interpreting section 1098 are consistent with this construction. Indeed, cases have consistently held that it is error to try together different defendants for different crimes unless at least one count of the accusatory pleading charges all the defendants with a single crime." (*People v. Ortiz* (1978) 22 Cal.3d 38, 43, fns. omitted.)

Defendants' contention must be rejected.

" ' "The law prefers consolidation of charges." ' " [Citations.] 'An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated.' (§ 954.)

". . . To demonstrate that a denial of severance was reversible error, defendant must ' "clearly establish that there [was] a substantial danger of prejudice requiring that the charges be separately tried." ' [Citation.]

"Refusal to sever charges on a defendant's motion *may* be an abuse of discretion where: ' "(1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a 'weak' case has been joined with a 'strong' case, or with another 'weak' case, so that the 'spillover' effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty." ' " (*People v. Smith* (2007) 40 Cal.4th 483, 510.)

" 'We review a trial court's denial of a severance motion for abuse of discretion based upon the facts as they appeared when the court ruled on the motion.' [Citations.] ' . . . [R]eversal is required only if it is reasonably probable the defendant would have obtained a more favorable result at a separate trial.' [Citations.] 'If the court's joinder ruling was proper when it was made, however, we may reverse a judgment only on a showing that joinder " 'resulted in "gross unfairness" amounting to a denial of due process.' " ' [Citations.]" (*People v. Souza* (2012) 54 Cal.4th 90, 109.)

Defendants' contention is founded on an interpretation of the evidence rejected by the jury. It has already been shown that the evidence showed a single criminal purpose. Thus, the charges were joint within the language of section 1098. Evidence of the April 28 attack would be admissible for consideration of the May 16 attack, and vice versa. Indeed, the second attack is comprehensible only with knowledge that the first attack had failed. The only inflammatory subject was the West Mob, but that subject was

16

not confined to the charges against only Brown or Taylor.  The case against Brown might be considered less potent than the one against Taylor, which had three eyewitnesses as opposed to the two against Brown.  Yet the comparison is not lopsided.  This was not a capital case at any point or in any sense.  In light of the circumstances, the trial court's ruling does not amount to discretion abused.  Nothing in the record of the ensuing trial alters that conclusion.  (*People v. Souza*, *supra*, 54 Cal.4th 90, 109; *People v. Smith*, *supra*, 40 Cal.4th 483, 510.)

### Taylor's Trial Counsel Was Not Incompetent For Not Moving For a Mistrial

Taylor contends his trial attorney rendered ineffective assistance because of what occurred during his extensive cross-examination of the prosecution's gang expert.  Almost 90 pages into his cross-examination of Inspector Broberg, Taylor's attorney started posing questions about a photograph:

"Q. . . . I'm showing you People's 104.  It's a photograph of Anthony Taylor, and the caption is dat Gullyside shit, right?

"A.  Yes.

"Q.  And you commented that dat Gullyside shit means something.  What do you think it means?

"A.  It's referring to activities, references activities within West Mob, with Gullyside, and then when they're talking about Gullyside shit, individuals that are there, and then the shit movement, it could be one and the same, activities."  [¶] . . . [¶]

"Q.  Let me ask you this:  Dat Gullyside shit that you see depicted in the photograph that you were able to retrieve from MySpace, correct?

"A.  Yes.

"Q.  Is it possible that dat Gullyside shit could be referring to the marijuana that Mr. Taylor is smoking there, dat Gullyside shit, good shit?

"A.  Well —

"Q.  Is it possible?

"A. You know, it could refer to a few things. There is also a young man, Martell Peters, whose nickname was Gully. So there are any number of things that it could be specifically in reference to, and I guess maybe Mr. Taylor would be able to tell us in this particular incident what the intended.

"MS. KAPLAN [Brown's counsel]: Objection, your Honor.

"THE COURT: Sustained.

"MR. UMALI [Taylor's counsel]: Could the jury be instructed

"THE COURT: Don't tell me how to do my job, Mr. Umali, please.

"MR. UMALI: Thank you.

"THE COURT: Ladies and gentlemen, you will disregard that statement.

"MR. UMALI: Q. Let me ask you: So dat Gullyside shit could mean a reference to marijuana, marijuana that he's smoking in the picture; is that correct?

"A. It's always a possibility."

Treating the witness's "maybe Mr. Taylor would be able to tell us" comment as a violation of *Griffin v. California* (1965) 380 U.S. 609, Taylor contends he "was prejudicially deprived of the effective assistance of counsel when his trial attorney failed to move for a mistrial after the police gang expert suggested that Mr. Taylor should testify and failed to object to other improper comments by prosecution witnesses." He further faults counsel for failing to object to several other instances of "improper comments by prosecution witnesses."

"Defendant has the burden of proving ineffective assistance of counsel. [Citation.] To prevail on a claim of ineffective assistance of counsel, a defendant ' "must establish not only deficient performance, i.e., representation below an objective standard of reasonableness, but also resultant prejudice." ' [Citation.] A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. [Citation.] Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts. [Citation.] To the extent the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, we will affirm the judgment unless counsel was asked for an

18

explanation and failed to provide one, or unless there simply could be no satisfactory explanation. [Citation.] Moreover, prejudice must be affirmatively proved; the record must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citation.]" (*People v. Maury*, *supra*, 30 Cal.4th 342, 389.)

" 'Reviewing courts defer to counsel's reasonable tactical decisions . . . , and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." ' [Citation.] . . . '[W]e accord great deference to counsel's tactical decisions' [citation], and we have explained that 'courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight.' [Citation.] 'Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts.' [Citation.]" (*People v. Weaver* (2001) 26 Cal.4th 876, 925–926.)

" 'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.] Accordingly, it would be a rare case in which the merits of a mistrial motion were so clear that counsel's failure to make the motion would amount to ineffective assistance.' " (*People v. Jennings* (1991) 53 Cal.3d 334, 380.)

Taylor rightly lays stress on the fact that the court had previously admonished Inspector Broberg to "be careful with your words." And while the inspector's answer was immediately recognized by all concerned as inappropriate, it was brief, and did not prevent trial counsel from making the important point that the caption could bear a fairly benign interpretation. Just the day before, Taylor's counsel had sought a mistrial for something else said on the stand by Inspector Broberg. That motion had not succeeded, and counsel could make the reasonable tactical decision that this trial judge thought the

harm was curable by admonition and thus was unlikely to actually grant a mistrial so far into the case.

As for Taylor's "other improper comments by prosecution witnesses," they are only two in number, and Taylor makes no effort to establish that the comments were indeed "improper." In any event, even assuming solely for present purposes that the comments were objectionable, Taylor's trial counsel could reasonably conclude that objecting would only emphasize the comments to the jury. (See *People v. Padilla* (1995) 11 Cal.4th 891, 958 ["defense counsel's failure to object was probably a conscious tactical decision and a sensible one at that, taken so as not to draw the jury's attention to remarks that were, in context, fleeting"]; *People v. Gurule* (2002) 28 Cal.4th 557, 610 ["defense counsel may simply have desired not to highlight the comment by objecting"]; *People v. Saldana* (1984) 157 Cal.App.3d 443, 463 [counsel could reasonably decide not to move that testimony be stricken because "such a motion could only have served to call the jury's attention to the statement which defense counsel wished them to ignore"].) "[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance." (*People v. Maury*, *supra*, 30 Cal.4th 342, 419.) Moreover, three brief remarks during the course of a lengthy trial do not impress us as having the intrinsic and irreversible power to destroy the reliability of the process. In short, singly and collectively, the witness responses Taylor targets have not undermined confidence in the jury's verdict. (*Id.* at p. 389.)

### The Restitution Fines Were Not Unauthorized

When sentenced on August 1, 2013, each defendant was ordered to "pay a restitution fine in the amount of $280 pursuant to PC 1202.4. An additional restitution fine in the same amount is imposed pursuant to PC 1202.45." Taylor introduces his final contention, in which Brown joins: "Section 1202.4 requires the court to impose a restitution fine in every criminal case unless the court finds compelling and extraordinary reasons not to impose it. (§ 1202.4, subd. (b).) In addition, if the sentence 'includes a period of parole,' the court must impose a 'parole revocation restitution fine in the same amount' as the restitution fine. (§ 1202.45, subd. (a).) [¶] Under the version of

20

section 1202.4 in effect when the incident in this case occurred, the minimum restitution fine for a felony was $200. (Former § 1202.4, subd. (b)(1).) In 2011, the Legislature amended section 1202.4, subdivision (b)(1), raising the minimum restitution fine to $240 'starting on January 1, 2012,' $280 'starting on January 1, 2013,' and $300 'starting on January 1, 2014.' (Stats. 2011, ch. 358, § 1.) Section 1202.45 remained the same in all material respects." So, by imposing the 2013 fine for 2009 offenses, "the trial court's retroactive use of the new $280 statutory minimum violated the constitutional prohibition on ex post [facto] laws." Anticipating the Attorney General's response that the failure of trial counsel to object at the time of sentencing works a forfeiture of the issue, Taylor and Brown contend that their respective counsel was constitutionally ineffective for failing to make that objection.

"It is well established that the imposition of restitution fines constitutes punishment, and therefore is subject to the proscriptions of the ex post facto clause . . . ." (*People v. Souza*, *supra*, 54 Cal.4th 90, 143.) However, as a general rule, claims of sentencing are forfeited unless the defendant made a contemporaneous objection. (*People v. Scott* (1994) 9 Cal.4th 331, 351–353.) This principle extends to ex post facto violations. (*People v. Martinez* (2014) 226 Cal.App.4th 1169, 1189; *People v. Hiscox* (2006) 136 Cal.App.4th 253, 259–260.) An exception is made for a decision that qualifies as an illegal sentence, meaning one that cannot properly be imposed under any circumstances. (*People v. Scott*, *supra*, at p. 354.) But a $280 fine for a 2009 offense is not categorically prohibited by section 1202.4. It would only be unauthorized if it was being used as the mandatory minimum. There is consequently no reason not to apply the forfeiture principle.

Defendants mean to avoid that conclusion by setting up trial counsels' incompetence for failing to object to the fine's supposed invalidity. "When a claim of ineffective assistance is made on direct appeal, and the record does not show the reason for counsel's challenged actions or omissions, the conviction must be affirmed unless there could be no satisfactory explanation." (*People v. Anderson* (2001) 25 Cal.4th 543, 569.) Here, there could be a satisfactory explanation—the experienced trial attorneys

representing defendants, who presumably had knowledge of the sentencing judge's practices, knew that the $280 fine was not being treated as mandatory minimum.

## DISPOSITION

The judgments of conviction are affirmed.


_____
Richman, J.


We concur:


_____
Kline, P.J.


_____
Stewart, J.